UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------X
PATRICIA G. WILLIAMS,

                Plaintiff,                    **REPORT AND**
                                                      **RECOMMENDATION**

  - against -
                                                      05 CV 3202 (FB)

TRE'LLA BERNARD, et al.,

                Defendants.
----------------------------------------------------X

On July 5, 2005, plaintiff Patricia G. Williams commenced this action against defendants Tre'lla Bernard and Raymond Bernard, seeking damages resulting from defendants' alleged breach of contract to sell to plaintiff the premises located at 110-33 156th Street, Jamaica, New York (the "Premises"). Despite service of the Complaint on August 11, 2005, defendants failed to answer or otherwise move to dismiss the Complaint. On December 15, 2005, default was entered, and the case was subsequently referred to the undersigned to conduct an inquest and issue a Report and Recommendation on the issue of damages. On October 24, 2006, in response to the Court's inquest Order dated January 10, 2006, defendants, proceeding pro se, submitted a "Motion to dismiss default judgment," which in essence requested that the default be vacated so that the case could be set for trial. For the reasons set forth below, the Court respectfully recommends that the defendants' motion to vacate the default be granted.

FACTUAL BACKGROUND

According to the Complaint, defendants were the owners of the Premises located at 110-

33 156th Street in Jamaica, New York. (Compl. ¶ 4).[1] Plaintiff alleges that in September 2000, she entered into an agreement with defendants to purchase the Premises for the sum of $130,000. (Id. ¶ 4, Ex. 1; Bernard Aff. ¶ 1; Tr. at 2).[2] Plaintiff contends that the sale was made in order to prevent the Premises from being foreclosed upon due to defendants' failure to make mortgage payments to Wells Fargo Home Mortgage, Inc. ("Wells Fargo"). (Compl. ¶ 5; Tr. at 2).

As part of the agreement between the parties, plaintiff made a $13,000 payment, which she alleges was a down payment for the purchase of the Premises and which was to be applied to the amount due under the mortgage. (Compl. ¶ 6; Tr. at 2).[3] Thereafter, plaintiff moved into the Premises and continued to make payments to defendants, which she claims were to be applied to the amounts owed by defendants on the mortgage. (Compl. ¶¶ 7, 8; Tr. at 2). When plaintiff learned that the defendants were not making the mortgage payments to Wells Fargo, she began to remit payments directly to the mortgagee. (Compl. ¶ 9; Tr. at 2). In addition to making mortgage payments, plaintiff alleges that she made certain renovations and repairs to the Premises in an amount exceeding $25,000. (Compl. ¶ 10). She asserts that the cost of these repairs was to be deducted from the balance due on the purchase price at the time of the closing. (Id.)

The Complaint alleges that plaintiff made "numerous 'good faith' attempts" to close the

---

[1] Citations to "Compl." refer to plaintiff's Complaint dated June 30, 2005.

[2] Citations to "Bernard Aff." refer to the Affidavit of Tre'lla Bernard, included with defendants' motion to dismiss the default judgment dated October 24, 2006. Citations to "Tr." refer to the transcript of proceedings held before this Court on November 9, 2006.

[3] It appears that this amount was later supplemented by an additional payment of $7,775, which was also treated as part of plaintiff's down payment. (See Tr. at 10, 41-42).

2

transaction for the Premises, but that defendants ignored her requests to set a date for the closing. (Id. ¶ 11). Despite making the agreed-upon payments, plaintiff was illegally evicted from the Premises. (See id. ¶ 13). Plaintiff asserts claims that the defendants breached their agreement with the plaintiff, fraudulently sold the Premises to a third party, and defrauded plaintiff out of the purchase of said Premises while retaining the benefit of payments made thereby.

PROCEDURAL BACKGROUND

The current action was commenced by plaintiff on July 5, 2005. A private investigator hired by plaintiff served the Complaint upon the defendants at their residence, located at 3017 Thomas Lane, Augusta, Georgia 30906, on August 11, 2005. (Clayton Aff. ¶ 5; Tr. at 3).[4] When defendants failed to answer, plaintiff filed a motion for default judgment on November 16, 2005.

On December 15, 2005, the Clerk of Court entered the default, and the motion for default judgment was subsequently referred to the undersigned to conduct an inquest and issue a Report and Recommendation on the amount of damages to be awarded. On January 10, 2006, the Court issued an Order directing the parties to submit papers in connection with the calculation of damages by February 13, 2006. Thereafter, a hearing on plaintiff's motion for default damages was set for September 13, 2006, and the Court directed the plaintiff to serve notice of the hearing upon the defendants.

By letter dated September 12, 2006, defendant Tre'lla Bernard requested an adjournment of the hearing, which was subsequently rescheduled for November 9, 2006. On October 24,

---

[4]Citations to "Clayton Aff." refer to the Affirmation of Larinzo D. Clayton, Esq., dated November 15, 2005 and submitted in support of plaintiff's motion for default judgment.

2006, defendants filed the instant motion to vacate the default. A hearing on defendants' motion to vacate the default was held before this Court on November 9, 2006.

In their motion papers and at the November 2006 hearing, defendants disputed many of the plaintiff's claims. Ms. Bernard testified that in September 2000, she and her husband decided to sell their home at 110-33 156th Street, Jamaica, New York. (Tr. at 8). The tenant who had been renting the home had moved out, leaving the Bernards with two mortgages, one on their house in Brooklyn and another on a home in North Carolina, where they were residing at the time. (Id.) In the course of discussing their problem with their friends, Patricia and Padmore Williams, Mr. Williams suggested someone who he thought might be interested in purchasing the Bernards' home. (Id.) After that purchase fell through, Mr. Williams asked the Bernards if his wife could occupy the home with the hope of eventually purchasing it. (Id. at 8-9).

According to Ms. Bernard, the parties entered into an agreement whereby Ms. Williams agreed to pay sufficient funds to get the property out of foreclosure. (Id. at 9-10). Under the agreement, Ms. Williams was allowed to live in the house and given one year to obtain a new mortgage. (Id. at 10). Thus, defendants contend that the contract for sale was to be in force for one year, with the closing to take place on or before October 1, 2001, in order to allow plaintiff sufficient time to obtain a mortgage. (See Bernard Aff. ¶ 1).

Defendants dispute plaintiff's claims that she was required to make monthly mortgage payments,[5] asserting that when plaintiff moved into the home, she did so under a separate lease

---

[5]The Court notes that the Offer to Purchase Real Estate executed by Mr. Bernard on September 29, 2000 contains a handwritten term that provides: "Owner will retain mortgage. Beginning October 1st 2000 Buyer (Patricia Green Williams) will be responsible for all monies due for Mortgage and any late fees thereafter." (Compl., Ex. 1). Plaintiff has also submitted a

4

agreement whereby she was obligated to pay rent to defendants. (See id. ¶ 2). Defendants contend that during the time Ms. Williams was living in the home, she was obligated to pay a "lease amount" of $1,300 per month. (Tr. at 10). Defendants concede that at some point, they agreed to allow Ms. Williams to make payments directly to Wells Fargo, the mortgage company, because plaintiff's rental payments to defendants had been untimely, making it difficult for the Bernards to make their payments to the mortgage company without incurring late fees. (Bernard Aff. ¶ 2). Defendants claim that because plaintiff and her husband were friends and attended the same center of worship, they had no reservations about providing plaintiff with the Wells Fargo loan number. (Id.) Defendants also point out that on several occasions, plaintiff's checks were returned by the mortgage company for insufficient funds. (Id.)

Defendants assert not only that Ms. Williams failed to obtain a new mortgage, but also that she failed to pay the required "lease amount." (Tr. at 10-11). Instead, the Bernards claim that she only paid $960 per month to Wells Fargo to cover the Bernards' mortgage. (Id. at 10). They also claim that Ms. Williams failed to pay the utilities bill, which was an obligation under the lease agreement,[6] and that she sought reimbursement for $25,000 of unnecessary repairs to the house. (Id. at 11). Defendants contend that the contract provided for the sale of the house "as

---

copy of a check drawn from her personal account that is dated November 1, 2000 and issued to Wells Fargo in the amount of $969.08. (See id., Ex. 3 at 15). While these submissions may create a material issue of fact as to whether plaintiff was contractually obligated to remit mortgage payments on the Premises, they are not fatal to defendants' motion to vacate the default.

[6]Plaintiff's counsel counters that because the due date detailed on the utility bill submitted by the defendants is November 1, 2000, it could not possibly be the plaintiff's responsibility, as she had only been occupying the house since September 29, 2000. (See id. at 43-44, Ex. D).

5

is" and that plaintiff was to be responsible for the costs of any repairs. (Bernard Aff. ¶¶ 1, 4; Tr. at 11; see also Compl., Ex. 1). Moreover, defendants assert that plaintiff was never authorized to make renovations to the house and that she misrepresented herself as the "owner" of the Premises when she entered into a renovation contract with Three Star Home Improvement. (Bernard Aff. ¶ 4).

Defendants concede that they entered into a contract to sell the home to another purchaser, but contend that they waited until the year-long agreement with Ms. Williams had expired and she had failed to close on the house as required by the agreement. (See id. ¶ 3). Defendants further assert that plaintiff was aware of defendants' intentions to sell the home, as she was given six-months notice and even showed the home to prospective buyers. (Id. ¶ 6; Tr. at 12). As a result of her financial problems, plaintiff was placed in the position of being unable to stay in defendants' home but having no place else to move. (See Bernard Aff. ¶¶ 6, 7). Defendants claim that they placed $2,500 in an escrow account for Ms. Williams' moving expenses and that they ultimately consulted an attorney to have her evicted. (Id. ¶ 7).

The house was eventually sold near the end of October 2002, one year after the contract with plaintiff was to have closed. (Id. ¶ 3; Tr. at 15).[7] Prior to the sale, Mr. Bernard traveled to

---

[7]Plaintiff has attached, as Exhibit 7 to her Complaint, a purported contract of sale of the Premises to one Kathleen Cottle. (See Compl., Ex. 7). The contract is dated November 2001 (id.), and is cited by the plaintiff in support of her proposition that "[t]he Defendants during and prior to the period of the underlying contract of sale ma[d]e arrangements to (and did in fact) fraudulently sell said property to someone (likely Kathleen Cottle for $128,000.00) other than plaintiff without any meritorious reason therefore." (Id. ¶ 14). Defendants challenge the authenticity of the contract, contending that they do not know Ms. Cottle but believe that she is a friend of plaintiff's husband. (Bernard Aff. ¶ 3). Defendants further contend that even if they had executed the contract with Ms. Cottle, they "would have been within [their] rights to execute a contract because [they] were already outside the original contract time that [they] had with Mrs.

New York in September 2002 to speak with Mr. Williams about his wife vacating the home. (Bernard Aff. ¶ 6; Tr. at 15). According to Ms. Bernard, Mr. Williams assaulted Mr. Bernard and tore down the chandelier in the Bernards' home. (Tr. at 16).

The following month, the Bernards received a note from an attorney hired by Ms. Williams, stating that she had been trying to obtain a mortgage and that she was ready to move forward with the purchase. (Id.) When Ms. Williams contacted the attorney to ask for a copy of the contract that Ms. Williams claimed she had with the Bernards, the attorney apologized and said he would not contact the Bernards again. (Id.)

On the day of the sale of the property, the Bernards contacted Ms. Williams to gain access to the home. (Id. at 16-17). When she did not respond to their phone calls, the Bernards were forced to hire a locksmith to gain entry and change the locks. (Id.) Ms. Williams then filed an illegal eviction proceeding. (See id. at 17, Ex. H). The Bernards again tried to contact Ms. Williams regarding the key to the Premises at the time of the closing on the property, but she did not respond to their messages. (Id. at 17-18). While defendants admit that they have not returned plaintiff's down payment on the Premises, they cite to the aforementioned examples of plaintiff's deficient performance under the contract as justification for their failure to return the funds. (See id. at 28-31, 42-43). They contend that, at most, plaintiff may have a claim to the return of $4,000 of the down payment. (Id. at 42-43).

---

Williams." (Tr. at 14).

7

DISCUSSION

A. Motion to Vacate the Default

Rule 55(a) of the Federal Rules of Civil Procedure provides that "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend as provided by these rules and that fact is made to appear by affidavit or otherwise, the clerk shall enter the party's default." Fed. R. Civ. P. 55(a). Once a default has entered, the defendant may seek to set aside the default, pursuant to Rule 55(c) of the Federal Rules of Civil Procedure. See Fed. R. Civ. P. 55(c); Brown v. Gabbidon, No. 06 CV 8148, 2007 WL 1423788, at *2 (S.D.N.Y. May 14, 2007). If the defendant fails to appear or otherwise move to set aside the default, or the motion made pursuant to Rule 55(c) is unsuccessful, a default judgment may be entered against the defendant. See Fed. R. Civ. P. 55(b). Under Rule 55(c), the defendant is thereafter authorized to make a motion, pursuant to Fed. R. Civ. P. 60(b), to set aside the default judgment. See Meehan v. Snow, 652 F.2d 274, 276-77 (2d Cir. 1981).

A default judgment is an extreme remedy that should only be granted as a last resort. See id. at 277; Lichtenstein v. Jewelart, Inc., 95 F.R.D. 511, 513 (E.D.N.Y. 1982). While the Second Circuit has recognized the "push on a trial court to dispose of cases that, in disregard of the rules, are not processed expeditiously [and] . . . delay and clog its calendar," it has held that the district court must balance that interest with its responsibility to "[afford] litigants a reasonable chance to be heard." Enron Oil Corp. v. Diakuhara, 10 F.3d 90, 95-96 (2d Cir. 1993); see also Merker v. Rice, 649 F.2d 171, 174 (2d Cir. 1981). Thus, in light of the "oft-stated preference for resolving disputes on the merits," defaults are "generally disfavored," and doubts should be resolved in favor of the defaulting party. Enron Oil Corp. v. Diakuhara, 10 F.3d at 95-96.

"Decisions to vacate an entry of default are within the discretion of the court, and any doubts should be resolved in favor of a trial on the merits." Brown v. Gabbidon, 2007 WL 1423788, at *2 (citing Meehan v. Snow, 652 F.2d at 276-77). The factors that are used by a court to determine whether to set aside a default or a default judgment are the same. Enron Oil Corp. v. Diakuhara, 10 F.3d at 96; see also United States v. Bullen, No. 97 CV 7322, 1999 WL 118781, at *2 (E.D.N.Y. Mar. 1, 1999). However, it is well-established that "[a] motion to vacate a default is subject to a less rigorous standard than applies to a Rule 60(b) motion to vacate a default judgment." American Alliance Ins. Co., Ltd. v. Eagle Ins. Co., 92 F.3d 57, 59 (2d Cir. 1996) (citing Meehan v. Snow, 652 F.2d at 276); see also Enron Oil Corp. v. Diakuhara, 10 F.3d at 96 (noting that although the same factors are applied in determining whether to vacate a default or default judgment, "courts apply the factors more rigorously in the case of a default judgment . . . because the concepts of finality and litigation repose are more deeply implicated in the latter action") (internal citation omitted). Under this standard, the court should consider: 1) whether the defendant's default was willful; 2) whether setting aside the default would prejudice the adversary; and 3) whether a meritorious defense is presented. Enron Oil Corp. v. Diakuhara, 10 F.3d at 96; Meehan v. Snow, 652 F.2d at 277. The court may also consider other factors, such as whether the failure to follow a procedural rule was a mistake made in good faith and whether the entry of default would bring about an unfair or harsh result. See Enron Oil Corp. v. Diakuhara, 10 F.3d at 96 (citing Sony Corp. v. Elm State Elecs., Inc., 800 F.2d 317, 320 (2d Cir. 1986)).

Applying these criteria to the facts in the case at bar, this Court finds that defendants have

9

adequately shown good cause why the entry of default[8] should be vacated and why a default judgment should not be entered at this time.

B. Service

As an initial matter, it is clear that "[a] court may not properly enter a default judgment unless it has jurisdiction over the person of the party against whom the judgment is sought, 'which also means that he must have been effectively served with process.'" Copelco Capital, Inc. v. General Consel of Bol., 940 F. Supp. 93, 94 (S.D.N.Y. 1996) (internal citation omitted). As the Supreme Court noted in Henderson v. United States, 517 U.S. 654 (1996), "the core function of service is to supply notice of the pendency of a legal action, in a manner and at a time that affords the defendant a fair opportunity to answer the complaint and present defenses and objections." Id. at 672. The Second Circuit has further indicated that the notice must be "reasonably calculated to provide actual notice of the action." See National Dev. Co. v. Triad Holding Corp., 930 F.2d 253, 258 (2d Cir.) (citing Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 314 (1950)), cert. denied, 502 U.S. 968 (1991). It is well-established that

---

[8]In this action, an order with the caption "Notation of Default" was entered by the Deputy Clerk on December 15, 2005, and the district court subsequently granted the motion for default judgment while referring the calculation of damages to the undersigned. "A default judgment may be entered by a clerk only if a claim is liquidated or, if a claim is unliquidated, by the judge after a hearing on damages. Thus, a default judgment can be entered only after damages have been determined." Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp., No. 88 CV 3039, 1991 WL 148512, at *2 (E.D.N.Y. July 31, 1991) (citing Dow Chem. Pac. Ltd. v. Rascator Maritime, S.A., 782 F.2d 329, 336 (2d Cir. 1986) (holding that order denominated "Default Judgment" was not final in part because it expressly ordered damages inquest)); see also 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice & Procedure, § 2692 (3d ed. 1998).

"[w]hen the defendant challenges the sufficiency of service of process, the burden of proof is on the plaintiff to show the adequacy of service." Blue Ocean Lines v. Universal Process Equip., Inc., No. 93 CV 1722, 1993 WL 403961, at *4 (S.D.N.Y. Oct. 7, 1993) (internal citation omitted); accord Bey v. United States Postal Serv., No. 03 CV 4081, 2005 WL 2923516, at *1 (S.D.N.Y. Nov. 4, 1995).

In this case, plaintiff's submissions indicate that her process server served defendants with copies of the Summons and Complaint at defendants' residence, located at 3017 Thomas Lane, Augusta, Georgia. Although plaintiff has not provided the Court with a copy of the process server's affidavit, and the affidavit of service has not otherwise been filed with the court, defendants have admitted receiving personal service of the Summons and Complaint. Accordingly, this Court finds that plaintiff has satisfied her burden of showing proper service and that this Court has jurisdiction over the defendants.[9]

C. Enron Factors

The fact that defendants received the Summons and Complaint does not end this Court's inquiry, because the question remains whether this Court, in the exercise of its discretion, should recommend that the entry of default be set aside under the test set forth in Enron Oil Corp. v. Diakuhara, 10 F.3d at 96. As previously indicated, the court shall consider: 1) whether the default was willful; 2) whether setting aside the default would result in prejudice to the plaintiff; and 3) whether the defendants have presented a meritorious defense to the action.

---

[9] The Court has jurisdiction over the defendants, who are currently Georgia residents, because the property in dispute is located in New York.

1) <u>Willfulness</u>

Based on Ms. Bernard's testimony, the Court finds that defendants' failure to respond to the Complaint, although "willful," was justified by the prior relationship between the parties.

At the hearing, Ms. Bernard testified that when she received service of the Complaint, she contacted plaintiff's counsel to inquire as to what the case was about. (Tr. at 18, 21-22). According to Ms. Bernard, the attorney simply asked her questions about her "information," which she concluded he must have had in order to serve her in the first place. (<u>Id.</u> at 18, 22). Believing that this was just another attempt by Ms. Williams to harass the Bernards, Ms. Bernard concluded that plaintiff's counsel was just "another bogus attorney." (See <u>id.</u>) Specifically, when discussing their previous interactions with the plaintiff, Ms. Bernard testified:

> [O]ver the past few years, Mrs. Williams has had different friends call, people who we went to the same church with have been calling . . . . She already had an attorney call us once. She's been having people calling, saying they're attorneys or they're representing Mrs. Williams and so we just dismissed it, until more papers started coming, and being out of state we had no way of knowing, because there was nothing on any of these forms telling us who to respond to or how to respond to the claim.

(<u>Id.</u> at 18). Thus, given her belief that this was simply another attempt on plaintiff's part to harass them, the Bernards failed to respond to the Complaint. It was not until they received additional papers that they consulted with counsel and were advised that this was a legitimate court proceeding to which they should respond. (<u>Id.</u>)

Although there is no dispute that the Bernards were served, and Ms. Bernard even conceded that she spoke to plaintiff's counsel, the prior history between the parties led her to

12

believe that this was merely another attempt on the part of the plaintiff to harass the defendants. Especially in light of their pro se status, the Court concludes that defendants have shown sufficient "good cause" for their failure to respond to the Complaint in a timely fashion in order to merit vacating the default.

### 2) Prejudice

In considering whether to grant a motion to vacate a default, the Court must also consider any possible prejudice to the plaintiff. See Brown v. Gabbidon, 2007 WL 1423788, at *3. Here, plaintiff has not shown that her "'ability to pursue the claim has been hindered since the entry of the judgment'" or that there has been a loss of evidence or substantial reliance upon the judgment. Id. (quoting Farrell v. County Van & Storage, Inc., No. 96 CV 1174, 1996 WL 705276, at *3 (E.D.N.Y. Nov. 25, 1996)). Moreover, although the Premises were apparently sold in October 2002, this action was not commenced until July 2005, a delay in filing of more than two and one-half years. Defendants' failure to respond to the Complaint further delayed the action until October 2006, when they submitted their motion to vacate the default judgment. Therefore, if defendants satisfy the other Enron factor – namely, if they can present a meritorious defense – the Court finds that plaintiff would not prejudiced if the default was vacated.

### 3) Meritorious Defense

Defendants have articulated a meritorious defense to plaintiff's claims. They dispute plaintiff's claim that she was forced to make the mortgage payments because the defendants failed to do so, contending that the plaintiff was merely paying the mortgage as part of the rent

13

owed to the defendants until she could obtain her own mortgage to effectuate the purchase of the house. Defendants also dispute that plaintiff was prepared to close on the house within the terms of the contract and that she was wrongly evicted from the house, claiming instead that they were forced to sell the property to another purchaser after the contract expired and plaintiff still had not obtained a mortgage. If, as Ms. Bernard testified, she can establish these facts, defendants may have a meritorious defense to plaintiff's claims.

## CONCLUSION

Accordingly, having considered all of the relevant factors, the Court respectfully recommends that defendants' motion to vacate the default be granted.

Any objections to this Report and Recommendation must be filed with the Clerk of the Court, with a copy to the undersigned, within ten (10) days of receipt of this Report. Failure to file objections within the specified time waives the right to appeal the District Court's Order. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72; Small v. Sec'y of Health & Human Servs., 892 F.2d 15, 16 (2d Cir. 1989).

The Clerk is directed to send copies of this Order to the parties either electronically through the Electronic Case Filing (ECF) system.

**SO ORDERED.**

Dated: Brooklyn, New York
August 2, 2007

/s/ Cheryl Pollak
Cheryl L. Pollak
United States Magistrate Judge

14